UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | No. 09-cv-00893 (RJS) <br><br> CLASS ACTION |
| Plaintiff, | |
| vs. | |
| UBS AG, MARCEL OSPEL, MARCEL ROHNER, PETER WUFFLI, PETER KURER, RAOUL WEIL, MARTIN LIECHTI, MARK BRANSON and PHILLIP LOFTS, | |
| Defendants. | |
| THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, on behalf of itself and all others similarly situated, | No. 09-cv-2191 (RJS) <br><br> CLASS ACTION |
| Plaintiff, | |
| vs. | |
| UBS AG, MARCEL OSPEL, MARCEL ROHNER, PETER WUFFLI, PETER KURER, RAOUL WEIL, MARTIN LIECHTI, MARK BRANSON and PHILLIP LOFTS, MARCO SUTER, STEPHAN HAERINGER, ERNESTO BERTARELLI, GABRIELLE KAUFFMANN-KOHLER, SERGIO MARCHIONNE, ROLF A. MEYER, HELMUT PANKE, PETER SPUHLER, PETER R. VOSER, LAWRENCE A. WEINBACH and JOERG WOLLE, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION BY THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI FOR CONSOLIDATION OF THE RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD AND LIAISON COUNSEL**

The Public Employees' Retirement System of Mississippi ("Mississippi PERS") respectfully submits this memorandum of law in support of its motion to be appointed Lead Plaintiff pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), for approval of its selection of the law firm of Zimmerman Reed, P.L.L.P., as Lead Counsel and Cohen Milstein Sellers & Toll, P.L.L.C., as Liaison Counsel for the Class, and for consolidation of all related actions.

## PRELIMINARY STATEMENT

This action concerns violations of the federal securities laws by UBS AG ("UBS" or the "Company") and certain of its officers and directors ("Individual Defendants") (collectively "Defendants"). During the period from May 4, 2004, through January 26, 2009[1] ("Class Period"), Defendants disseminated materially false and misleading information concerning revenues obtained improperly by its Wealth Management division through the unlicensed sale of securities in the United States, including the sale of undeclared Swiss bank accounts. Defendants' misstatements artificially inflated the price of UBS's securities and caused substantial damage to the Company's investors.

In response to news of the fraud, two investors filed Class Action Complaints, and investors have now had the opportunity to move to serve as Lead Plaintiff. Pursuant to the PSLRA, this Court must appoint the most adequate plaintiff to serve as Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). Thus, the Court must consider which movant has the "largest financial

---

[1] Two related actions currently filed in this Court propose a Class Period of May 4, 2004 through January 26, 2009. *New Orleans Employees' Retirement System v. UBS AG, et al.*, 09 Civ. 0893 (S.D.N.Y. Jan. 30, 2009); *The Police and Fire Retirement System of the City of Detroit v. UBS AG, et al.*, 09 Civ. 2191 (S.D.N.Y. Mar. 10, 2009). Thus, Mississippi PERS adopts this Class Period for procedural purposes of its present motion.

2

interest" in the relief sought by the Class and whether there has been a *prima facie* showing that that movant is a typical and adequate class representative under Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Mississippi PERS is the most adequate plaintiff to serve as Lead Plaintiff on behalf of investors in this action. As set forth below, Mississippi PERS believes it has the most substantial financial interest in this matter as evidenced by, among other things, its significant loss on its investments in UBS securities during the Class Period. The PSLRA-mandated certification setting forth Mississippi PERS' transactions in UBS securities are attached hereto. *See* Declaration of Brian C. Gudmundson in Support of the Public Employees' Retirement System of Mississippi's Motion for Appointment as Lead Plaintiff and Approval of Counsel ("Gudmundson Decl.") at Exh. A. Also attached is a chart accompanying chart reflecting the calculations of Mississippi PERS' losses. *See* Gudmundson Decl., Exh. B. Pursuant to these transactions and losses, Mississippi PERS believes it has the most substantial financial interest in this matter.

Moreover, as a sophisticated institutional investor with experience serving as lead plaintiff and in supervising counsel in complex securities litigation, Mississippi PERS is the prototypical lead plaintiff envisioned by the PSLRA. This institution shares common goals with all Class members: litigating the case completely yet effectively and efficiently; strengthening corporate governance to protect investors from fraudulent reporting by publicly traded companies such as UBS; and ensuring that the Class will benefit from its active involvement and supervision of class counsel. Mississippi PERS now seeks appointment as Lead Plaintiff and is fully determined to prosecute this case on behalf of the Class. The Court can be assured that the appointment of Mississippi PERS as Lead Plaintiff will fulfill Congress' goal in enacting the

PSLRA to appoint institutional investors with a strong financial interest and that Mississippi PERS will vigorously represent the interests of the Class.

## STATEMENT OF FACTS

UBS is the world's largest money management firm. It is generally divided into three business units: Global Wealth Management and Business Banking, Global Asset Management and the Investment Bank. UBS trades its common stock on three exchanges: the New York Stock Exchange, the SWX Swiss Exchange, and the Tokyo Stock Exchange. As described herein and in the class action complaints currently filed in this District, UBS and the Individual Defendants[2] misled the market during the Class Period regarding a massive scheme it perpetrated to reap improper revenues from undeclared Swiss bank accounts sold to the wealthiest Americans. During this time period, Mississippi PERS purchased over 693,000 shares of UBS stock on the Swiss national exchange.

### Capturing American Money and Selling Tax Evasion

Many of the bedrock facts of UBS's now-exposed fraud have come from Bradley Birkenfeld, an American-born UBS banker operating out of Switzerland. After his indictment on charges of conspiracy to commit tax evasion, Birkenfeld testified about his role in Defendants' tax evasion scheme before the U.S. Senate's Permanent Subcommittee on Investigations and further detailed the fraud in his later guilty plea. According to a staff report issued by the permanent subcommittee, "from at least 2000 through 2007, UBS made a concerted effort to

---

[2] These officers include: (1) Marcel Ospel, Chairman of UBS from 2001 through April 23, 2008); (2) Peter Wuffli, Group CEO of UBS from 2003 through July 6, 2007; (3) Marcel Rohner Marcel Rohner, Group CEO of UBS from July 6, 2007, through the present; (4) Peter Kurer, Group General Counsel of UBS from 2001 through the present; (5) Raoul Weil, Head Of UBS International Wealth Management division from 2002 through 2007; (6) Martin Liechti, Head of UBS Wealth Management Americas International division; (7) Mark Branson, CFO of UBS Global Wealth Management and Business Banking division; and (8) Philip Lofts, Chief Risk Officer of UBS Global Wealth Management and Business Banking division.

open accounts in Switzerland for wealthy U.S. clients, employing practices that could facilitate, and have resulted in, tax evasion by U.S. clients." UBS opened an estimated 19,000 such "undeclared" accounts. According to Birkenfeld himself, these undeclared accounts held at least $20 billion of UBS's assets under management and provided UBS $200 million in annual revenue.

Defendants' fraud scheme described herein and by Bradley Birkenfeld was not complex. UBS simply sought a way to increase its Wealth Management division's critical "Net New Money" metric. In Defendants' eyes, one of the largest untapped revenue pools globally was formed by the ultra-wealthy in the United States. UBS sought to tap these vast resources, and made a concerted effort to train, encourage, and incentivize its Swiss bankers to solicit and obtain investment funds in the United States. UBS's Swiss bankers, however, were not licensed with the United States Securities and Exchange Commission ("SEC") to market securities products of any kind in the United States. Worse, UBS's weapon of choice in attracting the ultra-rich American investor was the undeclared Swiss bank account, which operates in total secrecy under Swiss law. As is described below, the United States prohibits undeclared Swiss bank accounts when funded with money from the U.S.; such undeclared accounts are considered illegal tax evasion devices.

UBS was aware of the restrictions on its Swiss bankers and in fact created a series of internal guidelines ostensibly barring such things as cold calling or prospecting in the U.S., soliciting new accounts in the U.S., even advertising or marketing designed for U.S. audiences, among many other prohibitions. According to Birkenfeld and the subcommittee's report, these prohibitions were mere window dressing. UBS openly encouraged its Swiss bankers to obtain new company revenues by flouting these internal guidelines. For example, according to

5

Birkenfeld, at UBS's behest, a specific team of its Swiss bankers traveled to the United States four to six times annually to solicit new business. To attract the ultra-wealthy to its Swiss team of salesmen, UBS sponsored elaborate events such as golf and tennis tournaments and yachting events.

UBS openly encouraged its Swiss sales force to improperly solicit funds in the United States. According to Birkenfeld, UBS gave him and others in the Swiss sales force Net New Money quotas and lavish rewards for bringing in money from the U.S. Internal UBS emails indicate the Swiss sales force responded, quadrupling the Net New Money drawn from the United States from 2004 to 2006.

In addition to encouraging its Swiss bankers to solicit funds in the U.S., UBS also helped them evade detection by U.S. authorities. For example, the Company instructed its Swiss bankers to officially declare sales trips to the U.S. as "pleasure," and even distributed special business cards that omitted any mention of the Wealth Management division.

**The Qualified Intermediary Regime**

UBS's Swiss bankers not only operated in secrecy to avoid detection for selling securities in the U.S. without a license, but also did so to assist their U.S. clients in flouting the tax reporting requirements of the Qualified Intermediary ("QI") regime. Beginning in 2000, the United States established the QI regime to increase tax revenues by rooting out tax evasion in offshore banking. Under this regime, foreign banks were allowed to voluntarily enter into a QI agreement with the United States Internal Revenue Service ("IRS"). These agreements, in turn, obligated the QI bank to identify and document customers holding U.S. investments, or who received United States source income into their offshore accounts. UBS entered into a QI agreement with the IRS in 2001.

Despite their status as a Qualified Intermediary, UBS trained its bankers and U.S. clients to evade QI reporting requirements. For example, UBS's Swiss bankers avoided detection by carrying client data into the U.S. transcribed in code and carrying ultra-encrypted "TAS" laptops. Birkenfeld testified he once purchased diamonds with an American client's funds and smuggled them in to the U.S. in a tube of toothpaste. UBS bankers also instructed their American clients on how to avoid detection of their undeclared accounts. According to Birkenfeld, UBS's Swiss bankers advised their U.S. clients to withdraw money from undeclared accounts using only special Swiss credit cards, to destroy all records relating to undeclared accounts, and to falsely describe any funds withdrawn from undeclared accounts as money loaned from UBS.

**Defendants' Fraudulent Statements and Omissions**

UBS's scheme and clandestine activities were critical to the results UBS reported to the investment community. Throughout the Class Period, UBS repeatedly touted its results and successes by pointing investors and analysts to its Net New Money metric and other metrics dependent upon Net New Money revenue, without ever disclosing these revenues were supported by illegally-obtained funds. When making reports, including on Form 6-K, to the SEC and investors, Defendants intentionally failed to disclose that UBS's operating income, net profit and earnings per share figures, as well as other income and profit results were based materially on revenue obtained by a fraudulent tax evasion scheme, which Defendants deliberately encouraged. Defendants knew their tax evasion scheme violated numerous U.S. and foreign regulations and rendered UBS's quarterly and annual reports materially false and misleading. The proof of the materiality of these misstatements and omissions is found in UBS's stock price, which plummeted as news of Defendants' scheme entered the market.

**The Truth Emerges and UBS's Stock Price Plummets**

Despite their efforts, Defendants could not keep their tax evasion scheme hidden forever. On May 6, 2008, UBS announced that the Department of Justice ("DOJ") and the SEC had commenced an investigation into potential violations of the QI regime by UBS's Swiss-based bankers. Information regarding potential violations in this area of the Company was critical to the investing community. As one media outlet reported, UBS's Wealth Management division had been the company's strength, and, "[t]he apparent escalation of tax investigations could damage that business." The May 6, 2008 news of the U.S. investigations was a partial disclosure, the first of many, of the trouble to hit UBS. When this news broke, UBS's stock price on the Swiss exchange dropped, closing down 1.55 Swiss francs ($1.36 U.S. dollars,) or 4.5%, on May 6 on unusually heavy trading. As the news was absorbed by the market, the price continued to drop the rest of the week. By May 9, 2008, UBS's stock price had fallen 4.07 Swiss francs ($3.50 U.S. dollars), or 11.8%. The company's stock price on the NYSE was equally responsive to the news, sinking $3.05, or 9.6%, during the same period.

The May 6, 2008, revelations were the first of many partial disclosures to cause UBS's stock price to drop responsively in both the Swiss exchange and the NYSE. By the end of the Class Period, the Company's stock price had deflated cataclysmically on both exchanges. In total, from May 5, 2008 (the day before the first partial disclosure) to January 26, 2009 (the end of the Class Period), Defendants' fraud caused UBS's stock price on the Swiss exchange to plunge 20.02 Swiss franks ($18.70 U.S. dollars), from 34.33 Swiss francs ($31.32) to 14.42 Swiss francs ($12.62), or 58.0%. During the same time period, the Company's stock dropped $19.78 on the NYSE, from $32.04 to $12.26, or 61.7%.

8

## PROCEDURAL POSTURE

Following the disclosures of Defendants' scheme and improper revenues in its Wealth Management division, two securities class actions were filed seeking recovery of losses suffered by UBS investors. The first-filed action, *New Orleans Employees' Retirement System v. UBS AG, et al.*, 09-cv-0893, was filed in this District on January 30, 2009, and announced in a press release the same day. According to the PSLRA, any member of the Class may move for appointment as Lead Plaintiff within 60 days of publication of notice that the first action asserting substantially similar claims has been filed. *See* 15 U.S.C. § 77z-1(a)(3)(A); 15 U.S.C. § 78u-4(a)(3)(A). Accordingly, the January 30, 2009, press release indicated a March 31, 2009, deadline for any investor wishing to seek appointment as lead plaintiff. *See* Gudmundson Decl., Exh. C. Mississippi PERS has satisfied this requirement by timely filing its present motion. In addition, as is explained below, Mississippi PERS believes it amply satisfies all other requirements and respectfully asks this Court to appoint it to serve as Lead Plaintiff.

## ARGUMENT

### I. THE COURT SHOULD APPOINT MISSISSIPPI PERS LEAD PLAINTIFF.

Section 21D(a)(3)(B) of the PSLRA sets forth the procedure selecting the Lead Plaintiff in class actions brought under the Exchange Act. The PSLRA directs courts to consider any motion to serve as Lead Plaintiff filed by a class member in response to a published notice of class action by the later of: (i) 90 days after the date of publication, or (ii) as soon as practicable after the Court decides any pending motion to consolidate. 15 U.S.C. §78u-4(a)(3)(B)(i) and (ii). Further, the PSLRA provides a "rebuttable presumption" that the most "adequate plaintiff" to serve as Lead Plaintiff is the "person or group of persons" that:

> (aa) has either filed the complaint or made a motion in response to a notice . . .;

9

> (bb) in the determination of the Court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii); *see also In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 436 (S.D.N.Y. 2008); *Reimer v. Ambac Fin. Group, Inc.*, No. 08 Civ. 0411, 2008 WL 2073931, at *2 (S.D.N.Y. May 9, 2008). *See* Gudmundson Decl., Exh. D. As set forth below, Mississippi PERS satisfies all three of these criteria and is entitled to a presumption that it is the most adequate plaintiff. Because there are no grounds for rebuttal of this presumption, the Court should appoint Mississippi PERS to serve as Lead Plaintiff for the Class.

### A. Mississippi PERS Has Made a Motion In Response to a Notice Issued Under the PSLRA.

On January 30, 2009, counsel in the above-captioned action brought by the New Orleans Employees' Retirement System caused a Notice to be published pursuant to Sections 21D(a)(3)(A)(i) of the PSLRA. *See* Gudmundson Decl., Exh. C. The Notice announced that a securities class action had been filed against the Defendants based on allegations of the tax-evasion fraud scheme described herein. *Id.* The Notice also informed investors in UBS securities they had until March 31, 2009, to file a motion for appointment as Lead Plaintiff. *Id.* Mississippi PERS has filed the instant motion pursuant to the Notice and has attached a Certification attesting that it is willing to serve as Lead Plaintiff for the Class and is willing to provide testimony at deposition and trial, if necessary. *See* Gudmundson Decl., Exh. A. Mr. George Neville, a Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi, signed the Certification for Mississippi PERS and is authorized to litigate this case on behalf of Mississippi PERS to attempt to recover the losses in its investments of UBS

securities during the Class Period. Accordingly, Mississippi PERS satisfies the first requirement to serve as Lead Plaintiff for the Class.

### B. Mississippi PERS Has the Largest Financial Interest in the Action.

At the time of this filing, Mississippi PERS believes it has suffered the most substantial losses of any movant (indeed, possibly of any Class member) and therefore meets the second requirement for appointment as Lead Plaintiff. The PSLRA requires a court to adopt a rebuttable presumption that "the most adequate plaintiff . . . is the person or group of persons that . . . has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii); see *In re Donnkenny, Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y. 1997); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL No. 1500, 2003 WL *102806, at *2 (S.D.N.Y. Jan. 10, 2003). Gudmundson Decl., Exh. E. Courts generally recognize two principal methods for calculating losses for purpose of appointing a Lead Plaintiff. *Kaplan v. Gelfond*, 240 F.R.D. 88, 94 n.7 (S.D.N.Y. 2007); *In re Comverse Tech., Inc. Sec. Litig.*, 06 Civ. 1825, 2007 WL 680779, at *7 n.10 (E.D.N.Y. Mar. 2, 2007). Gudmundson Decl., Exh. F. These are the first-in-first-out ("FIFO") method and the last-in-first-out ("LIFO") method. *Id.* Under FIFO, "stocks which were acquired first are assumed to be sold first for the purpose of loss calculations." *Kaplan*, 240 F.R.D. at 94 n.7. Under LIFO, "those stocks which were acquired most recently are assumed to be sold first." *Id.* While some courts have stated a preference for LIFO, the PSLRA itself does not favor either method and courts may apply either method when appointing Lead Plaintiff. *See id.* (applying FIFO analysis to determine largest loss and presumptive lead plaintiff.) Under either calculation, as of the time of the filing of this motion, Mississippi PERS believes it has the largest financial interest of any investor in the relief sought by the Class.

During the Class Period, Mississippi PERS purchased 693,671 shares of UBS securities at a cost of $19,111,204.98. Under the FIFO method, Mississippi PERS suffered a loss of approximately $12,016,593 related to its transactions of UBS securities. Under the LIFO method, Mississippi PERS suffered a loss of approximately $4,767,147 related to its transactions of UBS securities. *See* Gudmundson Decl., Exh. B. Because Mississippi PERS possesses the largest financial interest in the outcome of this litigation, it should be presumed to be the "most adequate" plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). Mississippi PERS satisfies the second requirement for appointment as Lead Plaintiff.

### C. Mississippi PERS Satisfies the Requirements of Rule 23 of the Federal Rules of Civil Procedure.

Mississippi PERS also satisfies the third and final requirement for appointment as Lead Plaintiff because it satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. *See* § 21D(a)(3)(B)(iii)(I)(cc) (in addition to possessing the largest financial interest in the outcome of the litigation, Lead Plaintiff must "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure."). In determining whether a Lead Plaintiff satisfies the requirements of Rule 23, the Court need not raise its inquiry to the level required in ruling on a motion for class certification. Rather, "At this stage in the litigation, one need only make a 'preliminary showing' that the Rule's typicality and adequacy requirements have been satisfied." *Kemp v. Universal American Fin. Corp.*, No. 05 Civ. 9883, No. 06 Civ. 871, 2006 WL 1190691, at *2 (S.D.N.Y. May 1, 2006) (*quoting In re Crayfish Co. Sec. Litig.*, No. 00 Civ. 6766, 2002 WL 1268013, at *4 (S.D.N.Y. Jun. 6, 2002)). *See* Gudmundson Decl., Exh. G. Further, of the four prerequisites of class certification contained in Rule 23(a), only typicality and adequacy of representation are relevant to determination of Lead Plaintiff. *Strougo v. Brantley Corp.*, 243 F.R.D. 100, 105 (S.D.N.Y. 2007); *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 49

(S.D.N.Y. 1998) (citing *Gluck v. Cellstar Corp.*, 976 F. Supp. 542, 546 (N.D. Tex. 1997) and *Fischler v. Amsouth Bancorporation*, 176 F.R.D. 583 (M.D. Fla. 1997)). Mississippi PERS amply satisfies both of these requirements.

### 1. *Mississippi PERS' Claims Are Typical of the Class.*

Mississippi PERS amply satisfies the typicality requirement. A proposed lead plaintiff's claims are typical of the class when that plaintiff's claims and injuries arise from the same event or course of conduct that gave rise to the claims of the other class members and are premised on the same legal theory. *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071, 2003 WL 21672085, at *2 (S.D.N.Y. Jul. 16, 2003). Gudmundson Decl., Exh. H.; *see Reimer*, 2008 WL 2073931 at *4 (typicality established where lead plaintiff movants purchased, "stock during the proposed class period at prices that allegedly were artificially inflated due to [defendant's] alleged misrepresentations and allegedly suffered losses when the misrepresentations came to light.").

Here, as all members of the Class do, Mississippi PERS alleges Defendants violated the Exchange Act by engaging in a series of material misstatements and omissions related to its involvement in and revenues derived from the tax evasion scheme. Mississippi PERS, as did all of the members of the Class, purchased UBS securities during the Class Period at prices artificially inflated, maintained, or stabilized by Defendants' misrepresentations and omissions and was damaged thereby. Thus, the close alignment of interests between Mississippi PERS and other Class members, as well as the strong desire of the proposed Lead Plaintiff to prosecute this action on behalf of the Class, provide ample reasons to grant Mississippi PERS' motion to serve as Lead Plaintiff for the Class.

*2. Mississippi PERS Will Adequately Represent the Interests of the Class.*

As is explained above, Mississippi PERS has the largest financial stake in this action and thus, is entitled to a presumption that it is the most adequate Lead Plaintiff. This may be rebutted only upon proof "by a purported member of the plaintiffs' class" that the presumptively most adequate plaintiff:

> (aa)   will not fairly and adequately protect the interest of the class; or
>
> (bb)   is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u-4(a)(3)(b)(iii)(I). Further, adequacy is established under Rule 23(a)(4) where, "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Kaplan*, 240 F.R.D. at 88.

Mississippi PERS more than satisfies any test for adequacy. Mississippi PERS is a multi-billion-dollar retirement system responsible for providing retirement benefits to over 75,000 retirees from the state of Mississippi and over 250,000 future retirees. Because it is a large fund responsible for the welfare of thousands, Mississippi PERS purchases thousands of shares of stock from hundreds of companies annually. As such a large purchaser, Mississippi PERS has been a repeated victim of securities fraud, and has suffered significant losses as a result. Such large, institutional investors are precisely the type of personally motivated investors the framers of the PSLRA intended should serve as Lead Plaintiffs. *See In re Donnkenny*, 171 F.R.D. at 157 ("Appointing lead plaintiff on the basis of financial interest, rather than on a 'first come, first serve' basis, was intended to ensure that institutional plaintiffs with expertise in the securities

market and real financial interests in the integrity of the market would control the litigation, not lawyers.").

Mississippi PERS has demonstrated its dedication to this litigation and its adequacy by submitting a Declaration that confirms their understanding of the obligations owed by the Lead Plaintiff to the Class. Gudmundson Decl., Exh. I. Mississippi PERS is not aware of any unique defenses Defendants could raise that would render it inadequate to represent the Class. There are no conflicts between Mississippi PERS and any member of the Class. Indeed, Mississippi PERS' interests are identical to those of all members of the Class. Finally, Mississippi PERS has extensive litigation experience as a lead plaintiff. *See* Gudmundson Decl., Exh. A (describing Mississippi PERS' litigation and lead plaintiff experience). This experience further establishes adequacy, and where two or more parties assert equal financial losses, the Court may find the more litigation-experienced candidate the most adequate Lead Plaintiff. *In re Pfizer Inc. Sec. Litig.*, 233 F.R.D. 334, 338 (S.D.N.Y. 2005). Mississippi PERS satisfies the adequacy requirement and should be appointed Lead Plaintiff.

## II. THE COURT SHOULD APPROVE LEAD PLAINTIFF'S SELECTION OF COUNSEL.

Under the PSLRA, the Lead Plaintiff has authority to select and retain lead and liaison counsel, subject to the approval of the Court. 15 U.S.C. 78u-4(a)(3)(B)(v). The Court should only interfere with Lead Plaintiff's selection when necessary "to protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa).

Mississippi PERS has selected the law firm of Zimmerman Reed as Lead Counsel and Cohen Milstein Sellers & Toll as Liaison Counsel. Zimmerman Reed and Cohen Milstein are highly experienced in the area of securities litigation and class actions, and have successfully prosecuted numerous complex matters and securities fraud class actions on behalf of investors,

15

as detailed in the firms' resumes. *See* Gudmundson Decl., Exhs. J and K. The combined extensive experience of these firms demonstrates Mississippi PERS has chosen counsel with the skill and knowledge to prosecute this action effectively and expeditiously. Thus, the Court may be assured that by approving Mississippi PERS' selection of Lead and Liaison Counsel, the members of the Class will receive the best legal representation available.

### III.  THE RELATED ACTIONS SHOULD BE CONSOLIDATED

As of the time of this filing, two actions have been filed by investors who purchased UBS securities on any exchange, *New Orleans Employees' Retirement System v. UBS AG, et al.*, 09-cv-0893, S.D.N.Y. Jan. 30, 2009) and *The Police and Fire Retirement System of the City of Detroit v. UBS AG, et al.*, 01-cv-2191 (S.D.N.Y. Mar. 10, 2009). Both of these actions are pending in this Court.

Consolidation is appropriate when, as here, there are actions pending in the same court that involve common questions of law or fact. *See* Fed. R. Civ. P. 42(a). Indeed, "consolidation is appropriate in the context of securities class actions if the complaints are based on the same public statements and reports." *Glauser v. EVCI Ctr. Colls. Holding Corp.*, 236 F.R.D. 184, 186 (S.D.N.Y. 2006); *see Ambac Fin. Group.*, 2008 WL 2073931 at *1. Here, both of the actions involve class claims on behalf of investors who purchased UBS's publicly traded securities during the Class Period in reliance upon the same materially false and misleading statements and omissions. Accordingly, these actions, and any previously or subsequently filed or transferred actions relating to the same misconduct by Defendants should be consolidated pursuant to Fed. R. Civ. P. 42(a).

## CONCLUSION

For the foregoing reasons, Mississippi PERS respectfully requests the Court issue an Order (a) appointing Mississippi PERS as Lead Plaintiff of the Class; (b) approving its selection of Zimmerman Reed, PLLP, as Lead Counsel and Cohen Milstein Sellers & Toll, PLLC, as Liaison Counsel; (c) consolidating all related actions in this Court pursuant to Fed. R. Civ. P. 42(a); and (d) granting such other relief as the Court may deem to be just and proper.

Dated: March 31, 2009

Respectfully submitted,

s/Catherine A. Torell
**COHEN MILSTEIN SELLERS & TOLL PLLC**
Catherine A. Torell (CT-0905)
150 East 52nd Street – 30th Floor
New York, NY 10022-6017
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
CTorell@cohenmilstein.com

Lisa M. Mezzetti (LM-5105)
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
LMezzetti@cohenmilstein.com

*Proposed Liaison Counsel for Public Employees' Retirement System of Mississippi*

**ZIMMERMAN REED, PLLP**
Carolyn G. Anderson, Esq.
Brian C. Gudmundson, Esq.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
cga@zimmreed.com
bcg@zimmreed.com

*Proposed Lead Counsel for Public Employees' Retirement System of Mississippi*

**LOCKRIDGE GRINDAL NAUEN, PLLP**
Richard A. Lockridge, Esq.
Gregg M. Fishbein, Esq.
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
ralockridge@locklaw.com
gmfishbein@locklaw.com