# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and all Others Similarly Situated, | ) ) ) ) |
| | ) Electronically Filed |
| Plaintiff, | ) ) Civil Action No. 09 Civ. 0893 (RJS) |
| | ) |
| vs. | ) Hon. Richard J. Sullivan ) |
| UBS AG, MARCEL OSPEL, MARCEL ROHNER, PETER WUFFLI, PETER KURER, RAOUL WEIL, MARTIN LIECHTI, MARK BRANSON, and PHILLIP LOFTS, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |
| THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, on Behalf of Itself and All Others Similarly Situated, | ) ) ) Electronically Filed ) |
| Plaintiff, | ) Civil Action No. 09 Civ. 2191 (RJS) ) |
| vs. | ) Hon. Richard J. Sullivan ) |
| UBS AG, MARCEL OSPEL, MARCEL ROHNER, PETER WUFFLI, PETER KURER, RAOUL WEIL, MARTIN LIECHTI, MARK BRANSON, PHILLIP LOFTS, MARCO SUTER, STEPHAN HAERINGER, ERNESTO BERTARELLI, GABRIELLE KAUFMANN-KOHLER SERGIO MARCHIONNE, ROLF A. MEYER, HELMUT PANKE, PETER SPUHLER, PETER R. VOSER, LAWRENCE A. WEINBACH, and JOERG WOLLE, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

# MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE ONTARIO TEACHERS' GROUP FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF LEAD COUNSEL

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..........................................................................................................1

RELEVANT BACKGROUND .........................................................................................................4

      A.      Ontario Teachers'................................................................................................5

      B.      Irish Life..............................................................................................................5

      C.      New Orleans........................................................................................................6

ARGUMENT ....................................................................................................................................9

I.      THE ONTARIO TEACHERS' GROUP'S MOTION IN THE TAX ACTIONS
      FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND
      APPROVAL OF SELECTION OF LEAD COUNSEL SHOULD BE GRANTED..........9

      A.      The Captioned Tax Actions Should Be Consolidated ............................................9

            1.      The Reform Act's Notice Requirement ....................................................9

            2.      The Tax Actions Should Be Consolidated................................................10

      B.      The Ontario Teachers' Group Should Be Appointed Lead Plaintiff ...................12

            1.      The Procedural Requirements Pursuant to the PSLRA ............................12

            2.      The Ontario Teachers' Group is the "Most Adequate Plaintiff" ...............12

                  (a)      The Ontario Teachers' Group Has the Largest
                              Financial Interest in the Outcome of the Action..........................12

                (b)      The Ontario Teachers' Group Otherwise Satisfies Rule 23..........13

                 (c)      The Ontario Teachers' Group is the  Prototypical Lead
                              Plaintiff Envisioned by the PSLRA ............................................15

      C.      The Court Should Approve the
            Ontario Teachers' Group's Choice of Counsel.....................................................16

II.     THE TAX ACTIONS AND THE SUBPRIME
      LITIGATION SHOULD HAVE SEPARATE LEAD PLAINTIFFS ..............................16

      A.      The Tax Fraud Allegations Are Unrelated to the Subprime Allegations
            and Should Not Have Been Included in the Subprime Litigation .......................16

            B.      The Court Should Appoint Separate
            Representation for the Tax Class .........................................................................19

CONCLUSION................................................................................................................................20

**<u>TABLE OF AUTHORITIES</u>**

**FEDERAL CASES**

*Almonte v. Coca-Cola Bottling Co. of N.Y., Inc.*,
    No. 95-cv-1458 (PCD), 1996 WL 768158 (D. Conn. 1996) ............................................11

*In re Bristol-Myers Squibb Sec. Litig.*,
    No. 00-cv-1990 (GEB)......................................................................................................20

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)..............................................................................................4

*In re Cyberonics Inc. Securities Litigation*,
    468 F. Supp. 2d 936 (S.D. Tex. 2006) ......................................................................17, 18

*In re eSpeed, Inc. Sec. Litig.*,
    232 F.R.D. 95 (S.D.N.Y. 2005) .......................................................................................13

*In re Fuwei Films Sec. Litig.*,
    247 F.R.D. 432 (S.D.N.Y. 2008) .........................................................................11, 12, 15

*Johnson v. Celotex Corp.*,
    899 F.2d 1281 (2d Cir. 1990)...........................................................................................11

*Kaplan v. Gelfond*,
    240 F.R.D. 88 (S.D.N.Y. 2007) .......................................................................................13

*Kuriakose v. Fed. Home Loan Mortgage Co.*,
    No. 08-cv-7281 (JFK), 2008 WL 4974839 (S.D.N.Y. Nov. 24, 2008) ............................13

*In re Leapfrog Enter., Inc. Sec. Litig.*,
    No. 03-cv-5421-RMW, 2005 WL 5327775 (N.D. Cal. July 5, 2005).........................17, 18

*Levitt v. Rogers*,
    257 Fed. Appx. 450, 452 (2d Cir. 2007)......................................................................2, 4

*Lipetz v. Wachovia Corp.*,
    No. 08-cv-6171 (RJS), 2008 WL 4615895 (S.D.N.Y. Oct. 10, 2008).................... 12-15

*In re Lucent Techs., Inc. Sec. Litig.*,
    221 F. Supp. 2d 472 (D.N.J. 2001) .................................................................................19

*Malcolm v. Nat'l Gypsum Co.*,
    995 F.2d 346 (2d Cir. 1993)...........................................................................................11

*Morrison v. Nat'l Australia Bank Ltd.*,
    547 F.3d 167 (2d Cir. 2008)..................................................................................14

*In re Pfizer Inc. Sec. Litig.*,
    233 F.R.D. 334 (S.D.N.Y. 2005) ........................................................................13

*In re Orion Sec. Litig.*,
    No. 08-cv-1328 (RJS), 2008 WL 2811358 (S.D.N.Y. July 8, 2008)..................12

*Ravens v. Iftikar*,
    174 F.R.D. 651 (N.D. Cal. 1997).........................................................................10

*Seidel v. Noah Educ. Holdings Ltd.*,
    No. 08-cv-9203 (RJS), 2009 WL 700782 (S.D.N.Y. Mar. 9, 2009).................11

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier*,
    No. 05-cv-1898 (SAS), 2005 WL 1322721 (S.D.N.Y. June 1, 2005) ...................... *passim*

*W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)..................................................................................6

*In re Waste Mgmt., Inc. Sec. Litig.*,
    128 F. Supp. 2d 401 (S.D. Tex. 2000) ...............................................................16

## DOCKETED CASES

*Carlson v. Xerox Corp.*,
    No. 00-cv-1621 (D. Conn. Dec. 20, 2001).........................................................19

*Gaines v. Bristol-Myers Squibb Co.*,
    No. 02-cv-2251 (LAP) (S.D.N.Y. Oct. 4, 2002) (Preska, J.)............................20

## STATUTES

15 U.S.C. § 78u-4(a) ................................................................................... *passim*

Fed. R. Civ. P. 23(a) ...................................................................................13, 14

## MISCELLANEOUS

H.R. Conf. Rep. No. 104-369 (1995),

    *as reprinted in* 1995 U.S.C.C.A.N. 730.......................................................10, 15

Ontario Teachers' Pension Plan Board ("Ontario Teachers'"), Irish Life Investment Managers and Irish Life Assurance plc (collectively, "Irish Life"), and New Orleans Employees' Retirement System ("New Orleans") (collectively, the "Ontario Teachers' Group") respectfully submit this Memorandum of Law in support of their motion, pursuant to Section 27(a)(3) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77z-1(a)(3), and Section 21D(a)(3) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3),[1] as amended by the Private Securities Litigation Reform Act of 1995 (the "Reform Act" or "PSLRA"), and Rule 42 of the Federal Rules of Civil Procedure ("Rule 42"), for an order: (i) consolidating the above-captioned, related actions (the "Tax Actions" or "Tax Litigation");[2] (ii) appointing the Ontario Teachers' Group as Lead Plaintiff of a class of purchasers of the publicly traded securities of UBS AG ("UBS" or the "Company") from May 4, 2004 to January 26, 2009, inclusive (the "Tax Class" and "Tax Class Period"); (iii) approving the Ontario Teachers' Group's selection of Labaton Sucharow LLP ("Labaton Sucharow") as Lead Counsel for the Class; and (iv) granting such other and further relief that the Court may deem just and proper.

## PRELIMINARY STATEMENT

Prior to the Reform Act, lead plaintiffs and lead counsel were appointed sometimes on a first-come first-served basis, and sometimes through the stipulation of counsel to their own appointment. To curb these perceived abuses, Congress implemented a paradigm based on fundamental notions of notice, adequacy, and financial interest. In particular, to instill transparency and disincentivize a race to the courthouse, the Reform Act required that upon the filing of the first complaint, the law firm filing the action must widely disseminate notice to the

---

[1] The Lead Plaintiff provisions of the Securities Act and the Exchange Act are identical. For the purpose of convenience, all citations to these provisions herein will be to the Exchange Act.

[2] *New Orleans Employees' Retirement System v. UBS AG*, No. 09-cv-0893 (RJS), is referred to herein as the "New Orleans Action;" *The Police & Fire Retirement System of the City of Detroit v. UBS AG*, No. 09-cv-2191 (RJS), is referred to herein as the "Detroit Action."

public so that any class member, not just the one who was first to file, may make an application for lead plaintiff. The notice must be specific as to the "claims asserted therein" and define the "purported plaintiff class." 15 U.S.C. § 78u(a)(3)(A)(i). The notice requirement was intended to draw investors with significant financial interests to seek appointment as lead plaintiff. The court must then select the "most adequate" lead plaintiff, which is presumptively the lead plaintiff applicant with the "largest financial interest in the relief sought by the class." *Id*. at (a)(3)(B)(i), (iii)(I).

The context of the lead plaintiff process in the Tax Actions is atypical due to the injection of the tax fraud allegations—without notice—in an earlier action asserting subprime mortgage-related allegations of fraud based upon wholly different facts on behalf of a far shorter class period.[3] In non-Reform Act litigation, plaintiffs are, in many ways, masters of their complaint. In stark contrast, the Reform Act limits plaintiffs to raise the claims for which they were appointed lead plaintiff. As Judge Scheindlin concluded, where wholly unrelated claims arise and the contours of a litigation are dramatically altered, the Reform Act requires a new notice and lead plaintiff process to ensure that the interests of class members are always advanced by a fiduciary appropriately vetted as the "most adequate" with the largest financial stake in the relief sought by the class, and clear of any conflicts of interest. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier*, No. 05-cv-1898 (SAS), 2005 WL 1322721, at *2 (S.D.N.Y. June 1, 2005) (Scheindlin, J.) ("*Bombardier*"); *see also Levitt v. Rogers*, 257 Fed. Appx. 450, 452 (2d Cir. 2007) (unpublished summary order) (acknowledging the lead plaintiff appointment should be revisited for compliance with the Reform Act when the underlying claims and the relief sought are sufficiently altered).

---

[3] *In re UBS AG Sec. Litig.*, No. 07-cv-11225 (RJS) (the "Subprime Litigation"), prosecuted by City of Pontiac Policemen's and Firemen's Retirement System, Arbejdsmarkedets Tillaegspension, Union Asset Management Holding AG, and International Fund Management (collectively, the "Subprime Lead Plaintiff Group").

The Ontario Teachers' Group agrees that the standard articulated by Judge Scheindlin is high. The proposed change requiring new notice and lead plaintiff process occur in rare instances. In the vast majority of cases, amended complaints adding new allegations, defendants and expanded class periods do not require a new lead plaintiff because, importantly, the allegations, claims, and parties have *some* nexus to the allegations that were the subject of the notice. Here, it is undisputed that the tax allegations have absolutely no relation to the subprime allegations upon which the appointment of the Subprime Lead Plaintiff Group was based. In view of the lack of any nexus between the tax and subprime allegations, this matter satisfies the high standard in *Bombardier*. To further illustrate the dramatic alteration to the contours of litigation, the Ontario Teachers' Group suffered cumulative losses of ***$24.4 million*** during the Subprime Noticed Class Period (defined below) compared to losses of ***$232.9 million*** during the Tax Class Period.

The lead plaintiff process in the Tax Litigation must go forward so that the allegations therein may be fully and adequately prosecuted by a lead plaintiff that is most adequate and has the largest financial interest in the relief sought by the Tax Class. The Ontario Teachers' Group respectfully submits that it is such a lead plaintiff, and further contends that the tax-related allegations contained in the Subprime Litigation should be severed or, at the least, a new lead plaintiff appointed to advance the tax claims.

The Ontario Teachers' Group believes that it is the "most adequate plaintiff" under the PSLRA to serve as the Lead Plaintiff on behalf of the Class in this Action. As set forth in detail below, the Ontario Teachers' Group, comprised of three sophisticated institutional investors overseeing a combined $135 billion in assets, suffered losses of approximately $232.9 million on its investments in UBS securities during the Tax Class Period, as calculated under the last-in-first-out ("LIFO") loss calculation methodology preferred by courts in this District.[4]

---

[4] A copy of the Reform Act-required Certifications submitted by the Ontario Teachers' Group is attached as Ex. A to the Declaration of Joseph A. Fonti (the "Fonti Decl."), submitted herewith. The Certifications sets forth the transactions of the Ontario Teachers' Group in UBS securities

In addition, the Ontario Teachers' Group satisfies the adequacy and typicality requirements of Rule 23 of the Federal Rules of Civil Procedure. It has interests consistent with all other class members and is ready and able to spearhead this litigation in the best interests of the Class.  The Ontario Teachers' Group is the "most adequate plaintiff" and should be appointed Lead Plaintiff.

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v), the Lead Plaintiff shall select and retain counsel to represent the class, subject to court approval.  The Ontario Teachers' Group's selection of Labaton Sucharow as Lead Counsel should be approved because, as demonstrated below, the firm has successfully litigated securities class actions for decades and has the requisite experience and resources to prosecute this Action.

## RELEVANT BACKGROUND

### The Ontario Teachers' Group

The Ontario Teachers' Group has made this motion in their capacity as fiduciaries to over 282,000 pensioners, and in the case of Irish Life, thousands of corporate shareholders.  These large institutional investors, which collectively oversee approximately $135 billion, seek to be appointed lead plaintiff in this case so that the very valuable tax fraud claims they possess along with class members are advanced by the "most adequate plaintiff."

While the members of the Ontario Teachers Group seek to be appointed lead plaintiff to assert the Tax Claims, their first priority is to see that this litigation is separately spearheaded by institutional investors whose financial interest, adequacy, and typicality have been established with respect to the relief sought here, pursuant to the Reform Act.  *See Levitt*, 257 Fed. Appx. at 452; *In re Cendant Corp. Litig.,* 264 F.3d 201, 264 (3d Cir. 2001) (noting that the legislative

during the Tax Class Period.  In addition, a chart reflecting the calculation of the Ontario Teachers' Group's losses on UBS securities purchased during the Tax Class Period is attached as Ex. B to the Fonti Declaration.

intent behind enacting the PSLRA was to encourage large institutional investors to serve as lead plaintiff).

A.   **Ontario Teachers'**

Ontario Teachers' is a pension plan organized for the benefits of the over 275,000 active and retired teachers of the Province of Ontario, Canada.  Ontario Teachers' is based in Toronto, Canada and has over US$100 billion assets under management.  Ontario Teachers' has substantial experience overseeing the prosecution of complex securities class action lawsuits as a lead plaintiff, serving as Co-Lead Plaintiff in *In re Nortel Networks Corp. Securities Litigation*, N. 05-MD-1659 (LAP) (S.D.N.Y.) (Preska, J.), in which a $1.3 billion settlement that included extensive corporate governance reforms was obtained on behalf of investors.  Ontario Teachers' also served as Co-Lead Plaintiff in *In re Williams Securities Litigation*, No. 02-CV-72 (N.D. Okla.), which resulted in a recovery of $311 million for the class.  Ontario Teachers' also currently serves as a Lead Plaintiff in *In re Biovail Securities Litigation*, No. 03-CV-8917 (RO) (S.D.N.Y.) (Owen, J.), in which a $138 million settlement is pending approval.  Ontario Teachers' active involvement in prosecuting securities fraud cases is reflective of its considerable commitment to redressing instances of wrongdoing in the U.S. and foreign capital markets.  The fund is known worldwide as an active and involved shareholder and has been instrumental in working with its peers in achieving not only significant and meaningful results for class members in securities fraud litigation, but also in the general area of improving corporate governance through proxy voting, board involvement, and lobbying for greater enforcement of securities regulations.

B.   **Irish Life**

Founded in 1939, Irish Life is the Republic of Ireland's third largest financial institution with assets in excess of $34 billion. Irish Life & Permanent plc is the combination of Irish Life, Irish Permanent, and TSB Bank, ILP and operates in both the insurance and retail banking markets.  Irish Life carries out insurance operations and is Ireland's number one provider of life

insurance and pension plans, as well as other savings and investment products for the retail market and provides group pension and other insurance products to corporations and other groups and associations.  Together, Irish Life's operations command a 20 percent share of its domestic market. Irish Life is a public company with its stock listed on the Irish stock exchange, also traded on the London and Frankfurt exchanges.  Irish Life is currently serving as a named plaintiff in *In re Vivendi Universal, S.A. Securities Litigation*, No.1:02-cv-05571-RJH-HBP (S.D.N.Y.), and as a class representative in *Cornwelll v. Credit Suisse Group*, No. 1:08-cv-03758-VM (S.D.N.Y.).

 **C.** **New Orleans**

 Founded in 1947, New Orleans currently manages approximately $400 million in assets and administers the pensions of approximately 4,000 beneficiaries.  The retirement system is a defined benefit plan as defined by Section 401(a) of the Internal Revenue Code.  New Orleans filed the first action and caused notice to be issued.  New Orleans has long been dedicated to representing the interests of its beneficiaries by serving as lead plaintiff in securities litigations, including actions pending in this District.  In particular, New Orleans is currently the lead plaintiff in *In re NovaGold Resources Ltd. Inc. Sec. Litig.,* 08-cv-7041-DLC (S.D.N.Y.) (Cote, J.), and *In re Celestica Sec. Litig,* 07-cv-00312-GBD (S.D.N.Y.) (Daniels J.).  New Orleans also served as lead plaintiff in *In re Omnicom Corp. Sec. Litig.* No. 1:02-cv-04483-WHP-MHD (S.D.N.Y.) (Pauley, J.), filed in 2002, and which is currently pending on appeal before the Second Circuit.

 Thus, as demonstrated herein, the Ontario Teachers' Group is the prototypical lead plaintiff under the PSLRA.[5]

---

[5] The Second Circuit Court of Appeals recently issued a decision, *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), holding that a plaintiff must be the beneficial owner of the underlying securities or an assignee of the beneficial owners' claims to have constitutional standing.  Each of the Ontario Teachers' Group members is the beneficial owner of the underlying UBS securities that are the subject of the Tax Actions, and are seeking relief for losses they each suffered.  *See, e.g.,* Joint Decl. of Colm O'Neill & Ciaran Long in

**<u>Summary of Factual Allegations</u>**

Defendant UBS has the world's largest private banking division, and is a global provider of wealth management, individual banking and investment banking services.  Based in Zurich, Switzerland, the Company provides a wide array of fixed income, equities, foreign exchange and investment banking services to customers in the United States and around the world.  In addition, UBS provides wealth management services ranging from asset management to estate planning to clients around the globe.  UBS maintains U.S. investment banking offices in Stamford, Connecticut, where it houses the world's largest trading floor, and in New York, New York. UBS has branch offices and subsidiaries in the United States and around the globe.

In each quarterly and annual report that UBS files, it reports to investors and analysts "Net New Money," the key metric for assessing the amount of new deposits the bank attracted during the reporting period and a primary indicator of the UBS's performance and future prospects.  Throughout the Tax Class Period, however, a material portion of this "Net New Money" was lured to UBS through a fraudulent scheme to help ultra-high net worth U.S. investors evade U.S. federal taxes by secreting billions of dollars of their funds in "undeclared" Swiss bank accounts.

Defendants touted the record levels of Net New Money attracted, reported record income, profits and earnings per share, and boasted of the Company's purported commitment to integrity and business ethics.  Defendants also routinely assured investors and analysts that the Company employed state of the art risk management tactics and had robust internal controls designed to identify and mitigate operational risks, such as unlawful conduct on U.S. soil.  These statements were all false and misleading because, at the time they were made, Defendants were actively engaged in a tax-fraud scheme.

Support of Irish Life Investment Mgrs Ltd.'s & Irish Life Assurance PLC's Mot. for Consol'n, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, ¶ 6 (Fonti Decl., Ex. C).

UBS was forced to admit that it made a concerted unlawful effort in the United States to open accounts in Switzerland for wealthy U.S. clients.  These practices included meeting with these clients in the United States and orchestrating Swiss bankers marketing of securities and banking services on U.S. soil without an appropriate license.

On February 18, 2009 UBS entered into a deferred prosecution agreement ("DPA") with the DOJ's Tax Division and the U.S. Attorney's Office for the Southern District of Florida, disclosing a plethora of specific U.S.-based and U.S.-directed conduct, the omission of which was material to UBS investors.[6]  As part of the DPA, UBS acknowledged and accepted its knowing violation of U.S. law:

> Beginning in 2000 and continuing until 2007, UBS, through certain private bankers and managers in the United States cross-border business, participated in a *scheme to defraud the United States and its agency, the IRS*, by actively assisting or otherwise facilitating a number of United States individual taxpayers in establishing accounts at UBS in a manner designed to conceal the United States taxpayers' ownership or beneficial interest in these accounts.   In this regard, these private bankers and managers *facilitated the creation of accounts in the names of offshore companies, allowing United States taxpayers to evade reporting requirements* and to trade in securities as well as other financial transactions[.]
>
> . . .
>
> Additionally, these private bankers and managers would actively assist or otherwise facilitate certain undeclared United States taxpayers, *who these private bankers and managers knew or should have known were evading United States taxes,* by meeting with these clients in the United States and communicating with them via United States jurisdictional means on a regular and recurring basis with respect to their UBS undeclared accounts.…  *Certain UBS executives and managers who knew of the conduct described in this paragraph continued to operate and expand the United States cross-border business because of its profitability*.

As the scheme was uncovered by U.S. authorities and UBS began disclosing the true nature of its Swiss banking business, the Company's stock price plummeted, causing

---

[6] The DPA was not entered into until after the filing of the Action.  After the Court appoints a Lead Plaintiff, the Lead Plaintiff will file a consolidated complaint which will undoubtedly include allegations based on the DPA.

substantial losses to UBS shareholders, falling from $33.77 per share on May 6, 2008 before the first partial disclosure of the tax fraud scheme, to a close of $12.26 per share on January 26, 2009, currently the last day of the Tax Class Period.  The share price continued to decline to $8.39 per share on February 23, 2009, after disclosure of the DPA and news of the U.S. government's enforcement of a 2008 IRS "John Doe" summons for the names of as many as 52,000 Americans with "undisclosed" accounts at UBS.[7]

## ARGUMENT

### I. THE ONTARIO TEACHERS' GROUP'S MOTION IN THE TAX ACTIONS FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF LEAD COUNSEL SHOULD BE GRANTED

#### A. The Captioned Tax Actions Should Be Consolidated

##### 1. The Reform Act's Notice Requirement

The Reform Act contemplates the filing, and consolidation, of multiple actions "asserting substantially the same claim or claims …." 15 U.S.C. § 78u-4(a)(3)(B)(ii).  For such substantially similar actions, only the plaintiff in the first-filed action must publish notice to putative class members.  *See* 15 U.S.C. § 78u-4(a)(3)(A)(ii).  The Reform Act established a comprehensive procedure for notifying purported plaintiff class members of their right to make a motion for lead plaintiff.  15 U.S.C. § 78u-4(a)(3)(A) (requiring plaintiff to publish "[n]ot later than 20 days after the date on which the complaint is filed … a notice advising members of the purported plaintiff class … of the pendency of the action, the claims asserted therein, and the purported class period ….").  Within sixty days following publication of the notice, "any member of the purported class may move the court to serve as lead plaintiff of the purported class."  *Id.*  New Orleans, the plaintiff who filed the first complaint in this Action, published a notice on *Globe Newswire* on January 30, 2009, *see* Fonti Decl., Ex. D, indicating that applications for appointment as lead plaintiff were to be made no later than March 31, 2009.

---

[7] Although not currently alleged in either of the Tax Actions, the Ontario Teachers' Group would add these "substantially similar" allegations in a consolidated complaint.

The Conference Committee report stated that the objective of the PSLRA was to encourage the "most capable" members of the class to lead the litigation:

> These provisions are intended to encourage the most capable representatives of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class. These provisions are intended to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel.

*Ravens v. Iftikar*, 174 F.R.D. 651, 659 (N.D. Cal. 1997) (quoting H.R. Conf. Rep. No. 104-369, at 32 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730, 731).

The standard for an adequate Reform Act notice is straightforward and rooted in fairness and process. Without notice of the particular claims and putative class period, however, "[i]t is entirely possible that other well-qualified lead plaintiffs would have moved had they been notified that they were potential class members." *Bombardier*, 2005 WL 1322721, at *2; *see also Ravens*, 174 F.R.D. at 657 (quoting H.R. Conf. Rep. No. 104-369 at 33, 1995 U.S.C.C.A.N. at 732) ("**This notice must identify the claims alleged in the lawsuit and the purported class period and inform potential class members**" of their right to intervene in the litigation. (emphasis added)). In view of the significance of notice in the class action context, Judge Scheindlin in *Bombardier* acknowledged that "in deciding a motion for the appointment of lead plaintiff under the PSLRA, courts have an independent duty to scrutinize the published notice and ensure that the notice comports with the objectives of the PSLRA." *Id.* (quotation omitted). As discussed *infra*, the notice published by New Orleans is sufficient for both of the Tax Actions because the two actions assert substantially similar claims, despite minor differences.

### 2.    The Tax Actions Should Be Consolidated

If more than one class action "asserting substantially the same claim or claims" under the federal securities laws has been filed, the Reform Act requires the Court to consider consolidation of the Tax Actions before the selection of a lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(ii). A court may consolidate two or more actions pursuant to Rule 42(a) of the

Federal Rules of Civil Procedure where the actions involve a "common question of law or fact." *See In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 435 (S.D.N.Y. 2008) (Sullivan, J.) (quoting Fed. R. Civ. P. 42(a)).  Courts have "broad discretion to determine whether consolidation is appropriate," but "the discretion to consolidate is not unfettered." *Johnson v. Celotex Corp.,* 899 F.2d 1281, 1284-85 (2d Cir. 1990).  "[W]hile a court may enter orders of consolidation to 'avoid unnecessary costs or delay,' '[c]onsiderations of convenience and economy must yield to a paramount concern for a fair and impartial trial.'"  *Seidel v. Noah Educ. Holdings Ltd.*, No. 08-cv-9203 (RJS), 2009 WL 700782, at *1 (S.D.N.Y. Mar. 9, 2009) (Sullivan, J.) (quoting *Johnson*, 899 F.2d at 1284-85).  The Second Circuit has emphasized the care with which the power to consolidate must be exercised:

> The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's - and defendant's - cause not be lost in the shadow of a towering mass litigation.

*Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993) (internal quotation omitted). On a motion to consolidate, the court must determine whether the actions involve sufficient common questions of law or fact such that consolidation would reduce the burden on available judicial resources, and whether the risks of prejudice to the parties or possible confusion resulting from the proposed consolidation outweigh these judicial benefits.  *See Almonte v. Coca-Cola Bottling Co. of N.Y., Inc.*, No. 95-cv-1458 (PCD), 1996 WL 768158, at *2 (D. Conn. 1996) (citing *Johnson*, 899 F.2d at 1285).

   The New Orleans and Detroit Actions, although different in certain respects, present similar factual and legal issues, as they both are based on the same wrongful course of conduct, namely Defendants' admitted strategy to attract Net New Money by recruiting U.S. clients to evade U.S. taxes by secreting their money in offshore bank accounts.  Each names overlapping defendants.  Although the Detroit Action adds claims under Sections 11 and 12 of the Securities Act and additional defendants, consolidation is nevertheless appropriate despite these "minor

differences." *See Fuwei Films*, 247 F.R.D. at 435 ("While the *Rubin* complaint does assert claims against additional defendants, including the underwriters, and contains slightly different facts and legal claims, neither the existence of additional defendants nor minor differences in facts and legal issues preclude consolidation."); *In re Orion Sec. Litig.*, No. 08-cv-1328 (RJS), 2008 WL 2811358, at *3 (S.D.N.Y. July 8, 2008) (Sullivan, J,.) (consolidating complaints that added claims under Sections 15 and 12(a)(2) with complaint that did not).  Because the Tax Actions arise from the same facts and circumstances and involve the same subject matter, similar discovery and class certification issues will be relevant to both actions.  Accordingly, consolidation of the New Orleans and Detroit Actions under Rule 42(a) is appropriate.

### B.    The Ontario Teachers' Group Should Be Appointed Lead Plaintiff

#### 1.    The Procedural Requirements Pursuant to the PSLRA

Under the procedures established by the Reform Act, a court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i); *Lipetz v. Wachovia Corp.*, No. 08-cv-6171 (RJS), 2008 WL 4615895, at *2 (S.D.N.Y. Oct. 10, 2008) (Sullivan, J.).  The Reform Act creates a rebuttable presumption that the most adequate plaintiff is the "person or group of persons" who is a named plaintiff or timely movant and otherwise satisfies the requirements of Federal Rule of Civil Procedure 23, provided that person or group of persons "has the largest financial interest in the relief sought by the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb); *Lipetz*, 2008 WL 4615895, at *2.

#### 2.    The Ontario Teachers' Group is the "Most Adequate Plaintiff"

##### (a)    The Ontario Teachers' Group Has the Largest Financial Interest in the Outcome of the Action

To the best of its and its counsel's knowledge, the Ontario Teachers' Group has a larger financial interest in the relief sought by the Class than any class member that has come forward

as a proposed lead plaintiff.  During the proposed Class Period, the Ontario Teachers' Group purchased UBS securities as reflected in its members' Certifications, and the Ontario Teachers' Group's losses are approximately $232.9 million as calculated under the LIFO loss calculation methodology.[8]  *See* Fonti Decl., Exs. A and B.

### (b)      The Ontario Teachers' Group Otherwise Satisfies Rule 23

According to 15 U.S.C. § 78u-4(a)(3)(B), in addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure."  Of the four criteria of Rule 23(a)—numerosity, commonality, typicality, and adequacy—"only two—typicality and adequacy—directly address the personal characteristics of the class representative."  *Lipetz*, 2008 WL 4615895, at *2 (quotation omitted).  Therefore, in deciding a lead plaintiff motion, the movant must make only a preliminary showing that the adequacy and typicality requirements under Rule 23 have been met.  *Id.*  As detailed below, the Ontario Teachers' Group satisfies both the typicality and adequacy requirements of Rule 23, thereby justifying its appointment as Lead Plaintiff.

---

[8] Among courts in this District and across the country, the LIFO loss calculation methodology is preferred over the first-in-first-out ("FIFO") loss calculation methodology.  *See, e.g., Kuriakose v. Fed. Home Loan Mortgage Co.,* No. 08-cv-7281 (JFK), 2008 WL 4974839, at *3 (S.D.N.Y. Nov. 24, 2008) (Keenan, J.) ("To calculate losses, courts favor the LIFO accounting method over FIFO"); *Kaplan v. Gelfond*, 240 F.R.D. 88, 94 n.7 (S.D.N.Y. 2007) (Buchwald, J.) ("Many courts have stated a preference for LIFO over FIFO in securities cases, since the inflation of stock prices over the course of the class period may have resulted in gains accrued to plaintiffs."); *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005) (Scheindlin, J.) (noting that "more recently, courts have preferred LIFO and have generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases." (quotation omitted)); *In re Pfizer Inc. Sec. Litig.*, 233 F.R.D. 334, 338 n.3 (S.D.N.Y. 2005) (Owen, J.) (noting general adoption of LIFO over FIFO for calculating lead plaintiff losses).  For the sake of completeness, the Ontario Teachers' Group's losses under the FIFO methodology are $256.1 million.

- 13 -

(i)     **The Ontario Teachers' Group**
        **Fulfills the Typicality Requirement**

Under Rule 23(a)(3), the claims or defenses of the representative party must be typical of those of the class.  Fed. R. Civ. P. 23(a)(3).  Typicality exists if "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Lipetz*, 2008 WL 4615895, at *2 (quoting *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).  A lead plaintiff's claims, however, "need not be identical to the claims of the class to satisfy the typicality requirement."  *Id.* (internal citation omitted).

The Ontario Teachers' Group seeks to represent a class of purchasers of UBS securities who have identical, non-competing and non-conflicting interests.  The Ontario Teachers' Group satisfies the typicality requirement because it: (1) purchased or acquired UBS securities during the Class Period at prices alleged to have been artificially inflated by Defendants' materially false and misleading statements and/or omissions; and (2) suffered damages when the truth was disclosed to the market.  Thus, the Ontario Teachers' Group's claims are typical of those of other class members since its claims and the claims of other class members arise out of the same course of events.[9]

(ii)    **The Ontario Teachers' Group**
        **Fulfills the Adequacy Requirement**

Under Rule 23(a)(4), the representative party must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In order to meet the adequacy requirement, "(1) there should be no conflict between the interests of the class and the named plaintiff nor should there be collusion among the litigants; and (2) the parties' attorney must be qualified,

---

[9] Although the Ontario Teachers' Group is confident that the facts of this case satisfy the necessary requirements for subject matter jurisdiction under the conduct test, *see Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 171 (2d Cir. 2008), it also satisfies the requirements under the effects test because New Orleans is a U.S. purchaser.  *See id.*

experienced, and generally able to conduct the proposed litigation." *Fuwei Films*, 247 F.R.D. at 436 (quotation omitted). "Additionally, the lead plaintiff should have a sufficient interest in the outcome to ensure vigorous advocacy." *Lipetz*, 2008 WL 4615895, at *2 (quotation omitted). The Ontario Teachers' Group's interests in this Action are perfectly aligned with the interests of absent class members, and Labaton Sucharow, its selected lead counsel, has decades of experience effectively prosecuting securities class actions. Having suffered losses of $232.9 million, the Ontario Teachers' Group certainly has a sufficient interest in the outcome of the litigation to ensure vigorous advocacy.[10] Accordingly, the Court can be assured that the Ontario Teachers' Group and its selected counsel will more than adequately protect the interests of absent class members.

(c)     **The Ontario Teachers' Group is the
<u>Prototypical Lead Plaintiff Envisioned by the PSLRA</u>**

In addition to satisfying the requirements of Rule 23, the Ontario Teachers' Group is composed of precisely the type of large, sophisticated institutional investors—the prototypical lead plaintiff—envisioned by the framers of the PSLRA. As noted by Congress in the Statement of Managers, the PSLRA was enacted "to increase the likelihood that institutional investors will serve as lead plaintiff[]," in part, because "[i]nstitutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake." H.R. Rep. No. 104-369 at 34, 1995 U.S.C.C.A.N. at 733. As discussed *supra*, the Ontario Teachers' Group is composed of three institutions that collectively manage $135 billion in assets; are fiduciaries to over 282,000 individuals; and have recovered more than $1.5 billion for investor classes through their role as lead plaintiff in previous securities class actions.

---

[10] The vigor of its advocacy is further underscored by the fact that New Orleans filed the first complaint and, together with Ontario Teachers', argued for the lead plaintiff process to go forward in order to obtain the best representation for the Tax Class.

- 15 -

C.    **The Court Should Approve the
Ontario Teachers' Group's Choice of Counsel**

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v), the lead plaintiff shall, subject to Court approval, select and retain counsel to represent the Class.  Labaton Sucharow has had a leading role in numerous important actions on behalf of defrauded investors.  Labaton Sucharow served as sole lead counsel in the Waste Management securities litigation, which resulted in a settlement of $457 million, one of the largest common-fund securities class action settlements ever achieved at that time.  *See* Labaton Sucharow Firm Resume (Fonti Decl., Ex. E); *see also In re Waste Mgmt., Inc. Sec. Litig.,* 128 F. Supp. 2d 401, 432 (S.D. Tex. 2000) (stating that Labaton Sucharow "ha[s] been shown to be knowledgeable about and experienced in federal securities fraud class actions").  Also, Labaton Sucharow is currently serving as lead or co-lead counsel in the securities fraud cases against, *inter alia*, *In re American International Group, Inc. Securities Litigation*, No. 04-cv-8141-DAB (S.D.N.Y.) (Batts, J.), *In re The Bear Stearns Cos. Securities, Deriviative, & ERISA Litigation*, 08-md-1963-RWS (S.D.N.Y.) (Sweet, J.), *Genovese v. Ashley* (*Fannie Mae*), 08-cv-07831-GEL (S.D.N.Y.) (Lynch, J.), *In re Take-Two Interactive Securities Litigation*, 06-cv-803-SWK (S.D.N.Y.) (Kram, J.), *NovaGold*, *Celestica*, *In re HealthSouth Corp. Sec. Litig.*, 03-cv-1500 (N.D. Ala.), and *In re Countrywide Financial Corp. Securities Litigation*, 07-cv-5295 (C.D. Cal.).  In *In re Monster Worldwide, Inc. Securities Litigation,* No. 07-cv-2237 (S.D.N.Y. filed Mar. 15, 2007), Judge Rakoff appointed Labaton Sucharow as lead counsel, stating that "the Labaton firm is very well known to . . . courts for the excellence of its representation." (*Id.,* Hr'g Tr. 24:25-25:1, June 14, 2007).

II.    **THE TAX ACTIONS AND THE SUBPRIME
LITIGATION SHOULD HAVE SEPARATE LEAD PLAINTIFFS**

A.    **The Tax Fraud Allegations Are Unrelated to the Subprime
Allegations and Should Not Have Been Included in the Subprime Litigation**

Ordinarily, the plaintiff is the master of his complaint.  The Reform Act, which applies to this action, materially altered this general rule by incorporating notice and lead plaintiff

- 16 -

appointment provisions.  Under the Reform Act, lead plaintiffs are only entitled to include allegations in complaints for which it has been appointed lead plaintiff.  While lead plaintiffs are routinely permitted to extend class periods to include new and related allegations or claims, they cannot materially alter the contours of a litigation by the addition of new unrelated claims, without first putting out notice to allow other more qualified investors the opportunity to step forward and participate.  This was the holding in the *Bombardier* where Judge Scheindlin recognized that to allow lead plaintiffs to amend complaints to add new allegations for expanded class periods and new securities for which they had not been appointed would upend the overarching purpose of the Reform Act.  Although "[c]ourts have generally disfavored republication of notice when a complaint is amended, even where the amendment alters the class period … republication is generally appropriate where an amended complaint asserts new theories or legal claims."  *Bombardier*, 2005 WL 1322721, at *2 (footnote omitted).  Judge Scheindlin in *Bombardier* focused on the policy considerations underpinning the notice provisions of the Reform Act and required the plaintiffs to republish notice and proceed through the lead plaintiff appointment process again:

> It is entirely possible that other well-qualified lead plaintiffs would have moved had they been notified that they were potential class members.
>
> Allowing plaintiffs in this case to proceed without publishing a new notice reflecting their additional claims would potentially exclude qualified movants from the lead plaintiff selection process.  Although appointment is certainly easier – and thus more efficient – when there is only one movant, it is contrary to the spirit of the PSLRA to achieve that efficiency by failing to notify potential movants of their rights.  **Where membership is substantially expanded by the filing of an amended complaint that *adds new claims*, fairness dictates that those new class members ought to be informed of the existence of pending claims that may affect their rights.**

*Id*, at *2-3 (emphasis added).[11]

---

[11] The courts in *In re Leapfrog Enterprises, Inc. Securities Litigation* and *In re Cyberonics Inc. Securities Litigation* both relied on Judge Scheindlin's reasoning in *Bombardier*, refusing to permit the addition of allegations that "dramatically alter[ed] the contours of the lawsuit," and

Allowing the Subprime Lead Plaintiffs to add unrelated tax fraud claims to their complaint would effect an end-run around the very Reform Act notice requirement that were designed to ensure fairness in the appointment of lead plaintiff in complex cases such as this.[12] The Subprime Lead Plaintiff Group was initially appointed on the basis of a 22 month class period from February 13, 2006 to December 11, 2007 (the "Subprime Noticed Class Period"). While that class period was appropriately extended to include matters related to subprime mortgage allegations, the Subprime Lead Plaintiff Group is now seeking to serve as lead plaintiff for a class period spanning nearly five years (pursuant to the relevant statute of limitations) and asserting totally new claims based solely upon the tax fraud allegations, without providing notice of these claims or being determined the most adequate plaintiff for these claims. This is the prototypical concern that led to the *Bombardier* decision. Indeed, the Ontario Teachers' Group did not have a substantial financial interest in the relief ***sought by the Subprime Litigation***, and "did not respond [to the notice] because the constraints of the original complaint excluded their participation in the class." *Cyberonics*, 468 F. Supp. 2d at 939. The losses of the Ontario Teachers' Class during the Subprime Noticed Class Period, as compared to their losses in the Tax Litigation class period of May 4, 2004 to January 26, 2009, bring these facts into stark contrast. The Ontario Teachers' Group suffered approximate losses of ***$24.4 million*** during the

---

required republication of notice. *See Leapfrog*, No. 03-cv-5421-RMW, 2005 WL 5327775, at *3 (N.D. Cal. July 5, 2005) ("Just as in *Teamsters*, where the court required new notice after a substantially amended complaint to ensure that the best plaintiff for the new class period and new allegations represented the class, the new claims and new scope of the [lead plaintiffs'] amended complaint necessitates new notice and lead plaintiff selection."); *Cyberonics* , 468 F. Supp. 2d 936, 940 (S.D. Tex. 2006) (citing *Bombardier* and reasoning that "The additional claims give rise to the possibility that a more appropriate lead plaintiff exists, a party which was not apprised of its inclusion in the lawsuits by the original notice.").

[12] In *In re American International Group,* the lead plaintiff added claims for defendants' alleged reinsurance scheme to the earlier claims for defendants' alleged bid rigging. A member of the class filed a new complaint and published a new Reform Act notice upon disclosure of the reinsurance claims. Judge Sprizzo allowed the lead plaintiff appointment process to go forward and determined that the existing lead plaintiff was the most adequate plaintiff for the expanded class period, and permitted it to prosecute both the bid-rigging and reinsurance claims.

Subprime Noticed Class Period, yet suffered approximate losses of **$232.9 million** during the Tax Class Period.  Members of the Tax Litigation class did not, and could not, assess any basis for seeking leadership over the tax fraud claims.  Accordingly, the lead plaintiff process initiated by New Orleans with the issuance of publicly disseminated notice, should result in the appointment of a new lead plaintiff to represent the tax fraud claims.

### B. <u>The Court Should Appoint Separate Representation for the Tax Class</u>

The new lead plaintiff process initiated by New Orleans should lead to the appointment of a new lead plaintiff. Under no circumstances should the Subprime Lead Plaintiff Group be appointed to represent the tax fraud claims. Even where new claims substantially overlap existing claims, at the very least courts have appointed a new lead plaintiff to prosecute the new claims.  *See In re Lucent Techs., Inc. Sec. Litig.*, 221 F. Supp. 2d 472, 476-77, 488 (D.N.J. 2001) (deciding motions to vacate a consolidation order).  In *Lucent*, the court concluded that initial claims concerning earnings projections "necessarily overlap[ped]" later-brought claims concerning improper revenue recognition practices, and were "closely related to the evidence necessary to try" both sets of claims.  *Id.* at 483.  Nevertheless, the court held that because the consolidated action "make[s] different claims over varying periods of time," a separate lead plaintiff and lead counsel for the revenue recognition would "benefit" the class, while maintaining a role for the original lead plaintiff.  *Id.* at 488.  *See also Carlson v. Xerox Corp.*, No. 00-cv-1621, slip op. at 6 (D. Conn. Dec. 20, 2001) (Fonti Decl., Ex. F) (reconsidering appointment of lead plaintiff in original action where newly-filed action included allegations "that are significantly broader in scope" than those in the original action; court appointed new lead plaintiff alongside current lead plaintiff "[i]n consideration of the utility of maintaining continuity between the two sets of cases .…").  Should the Court decide to consolidate the Tax Actions with the Subprime Litigation, appointment of the Ontario Teachers' Group as lead plaintiff over the tax fraud portion of the case would, at a minimum, serve the goal of appointing the "most adequate plaintiff" to prosecute those claims.

Nevertheless, the Ontario Teachers' Group maintains that severance of the tax-related allegations in the Subprime Litigation is the most appropriate course.  Under similar circumstances, Judge Preska signed a stipulation severing claims in a securities class action concerning separate and distinguishable conduct.  *See Gaines v. Bristol-Myers Squibb Co.*, No. 02-cv-2251 (LAP), slip op. (S.D.N.Y. Oct. 4, 2002) (Preska, J.) (Fonti Decl., Ex. G).  *Gaines* involved several different claims against Bristol-Myers Squibb Co. ("BMS"), including: (1) claims relating to false statements about BMS's drug Vanlev that were already pending in an earlier case against BMS, *In re Bristol-Myers Squibb Sec. Litig.*, No. 00-cv-1990 (GEB) (D.N.J.); (2) claims concerning an FDA filing for the drug Erbitux; and (3) claims concerning BMS's false financial statements.

## CONCLUSION

For the foregoing reasons, the Ontario Teachers' Group respectfully requests that the Court: (i) consolidate the above-captioned, related actions; (ii) appoint the Ontario Teachers' Group as Lead Plaintiff; (iii) approve Labaton Sucharow LLP as Lead Counsel for the Class; and (iv) grant such other and further relief that the Court may deem just and proper.

Dated: March 31, 2009                                  Respectfully submitted,

**LABATON SUCHAROW LLP**

By:  */s/ Christopher J. Keller*

Christopher J. Keller (CK-2347)
Eric J. Belfi (EB-8895)
Joseph A. Fonti (JF-3201)
Javier Bleichmar (JB-1104)
Dominic J. Auld
140 Broadway
New York, New York 10005
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477

*Attorneys for the Ontario Teachers' Group
and Proposed Lead Counsel for the Class*